On behalf of the Appalachians, Mr. Robert G. Black, on behalf of the Appalachians, Mr. Robert G. Black, on behalf of the Appalachians, Mr. Neil Boyd. Good morning, your honors. May it please the court. Again, my name is Robert G. Black. I represent all defendants and appellants on this matter. Your honors, there's a lot here, but essentially this matter springs from a 1986 consulting agreement. From that 1986 consulting agreement, what Arthur Pielet bargained for and what he received was an unsecured conditional stream of monthly payments. And those payments would be sound for as long as the company making them remained sound. What he didn't bargain for, what he didn't obtain, what he didn't purchase was some sort of lifetime annuity. Well, in a sense, however, your honors, he did get a little bit more than he bargained for because the company, the family company, although it had a heyday in its 1960s and 70s, in the mid-1980s was having some difficulties. Within two years of this consulting agreement, the limited partner, PBS1, came on board, made substantial investments, had substantial involvement. Were it not for those investments and involvements, likely that company could have gone under within two years and likely those payments would have stopped within two years. But it goes farther than that. An additional limited partner came on board later, invested substantial monies, had substantial involvement in the case. And due to that involvement, this company continued for ten years beyond even that. What's the relevance to the fact that these other companies or investors came in to play here? I think the relevance, your honor, is just in telling the entire story here that the company itself and the payments that were being made under the consulting agreement likely could have stopped, likely would have stopped if not for the significant involvement. Let's assume for a moment that they definitely would have stopped. Let's assume the other side concedes that without the intervention and investment by those two other entities that came in, the payments would have stopped. What is the relevance of that to how we decide this case now? The relevance, your honor, is in looking at what was bargained for in that consulting agreement. And just putting things in perspective in terms of these companies here allowed this consulting agreement to continue on because the company continued on with their substantial investment. Well, I mean, they could have come in with their investment and said, okay, we're going to make all these investments as long as there's an agreement for this consulting agreement is modified or done away with. But they didn't do that. You're not suggesting that their financial investments were in any way contingent on modification of this consulting agreement, right? I'm not suggesting that their financial contributions were any way contingent, but no, not at all. Okay, so they make investments. Nobody changed the consulting agreement. The consulting agreement remains what it is. And if it would have failed, the company would have failed, but for the investments, I still don't see what's the point, I guess, if you make it. The point, again, your honor, is I'm just trying to give a background as to how matters proceeded here to get to where we're at. Because this contract here, the payments unsecured, I'm sorry, unsecured conditional stream of monthly payments was kept alive by the intervention. Yeah, I mean, you've made that point. I don't know if you're going to disagree with it, but it was kept alive by that. So what? Well, let's move ahead from this. You have, the creditor's going to argue, Mr. Pilot, that he contracted for these payments to continue the stream of payments through his lifetime and then the life of his widow. Correct. Granted, and I think part of your argument is there's a well-settled rule that when a corporation purchases the assets of another corporation, the corporation is not liable for the debts or liabilities of the transferring corporation. That's the general rule. That's correct. But the case law has carved out exceptions. One of the exceptions to the corporate non-liability is where you have a continuation of the sellers or the original entity. Correct. We have Mr. Tang as sort of the common denominator in all of this. So tell us why that exception to the corporate non-liability rule does not and should not apply in this case. Well, Your Honor, as I understand the case law, when you're talking about that exception and you're talking about it being a mere continuation of same party type of thing, the specific purpose, and this is the Vernon Supreme Court case, the specific purpose of what was done had to be to squirrel away assets, basically, and place them out of the realm of the predecessor's creditors. Right. That's the argument of the plaintiff, I think. So why isn't that the case here where Mr. Tang shows up having an interest in all of these successor corporations and partnerships and businesses? Certainly. What happened here was Mr. Tang, as part of his restructuring of the corporations and as part of his estate planning, we had different corporations and a succession of corporations. But there's nothing here of record that says or shows that the whole purpose of the corporate restructuring was to avoid and evade responsibility here. Does it have to be shown under that? Fraud is not a requirement under that, is it? Fraud is not a technical requirement under that because fraud is a separate requirement. But though we're not talking about, per se, fraud, we're still talking about an activity or a pursuit where, okay, I'm doing this because I want to – I know about a claim and I want to evade responsibility for a claim or avoid responsibility for the claim. And for purposes of summary judgment, that's just not shown here. And, in fact, I can dovetail a little bit into another aspect here that in terms of that exception here, part of our argument is that it couldn't be decided by way of summary judgment. All right. Well, that's a separate issue. That's a separate issue. And I suppose it's a material fact. Right. So you've got – all right, you've alluded to the fraud element, which I think you've now sort of tacitly acknowledged is not really an element. Proof of a specific intent to defraud creditors is not an element of that exception. Not a specific element, no. Courts basically require what they call an identity or continuity of ownership. Correct. Why doesn't that exist here in light of Mr. Tang's involvement with all these companies? Well, I think that it goes beyond just Mr. Tang's involvement. They want to paint this as some sort of corporate shell game where because, you know, Mr. Tang is here and Mr. Tang is here and Mr. Tang is there, then it's basically the same thing. Sort of like a sophisticated game of hide the obligation, so to speak. Well, I wouldn't say hide the obligation. Well, that would be the argument on the other side. That would be their argument. Right. But it's what we – they're trying to paint this as some sort of corporate shell game. And this is actually – these things were done and restructured in full compliance with Illinois law. There's no assertions here that Illinois law was not met. And to touch further upon your fraud issue there, there was a determination by the court that, if I'm recalling correctly, that no fraud occurred here in terms of Mr. Tang's activities. They did bring a separate claim and count against it. Well, you're just saying, Mr. Black – I'm sorry to interrupt you. No, that's all right. Everything was done in the up and up, in the open. How about Arthur? Did Arthur know about all of these? Arthur expressly knew about the PBS-1. We have in the record that Arthur met with Mr. Zavis, the attorney. And what happened there was Mr. Zavis advised him that, look, your ability to get your payments is going to be stronger if Pilot Inc. and later renamed Pilot Corp. becomes Pilot LP, and Pilot LP brings in PBS-1 as a limited partner. Your ability to get those payments is going to be stronger. Mr. Arthur Pilot knew of this, knew of this happening, knew what was going on there in terms of – But did he know of the disillusion of PBS-1? I'm not sure that the record is clear on that point, whether he was aware of that. I know that Mr. Pilot did have a stroke in 1992. The dissolution occurred June 1, 1994, and I'm not certain the record is absolutely clear on that. The son that was involved in the corporation, was it James? James, yes. Is James the bio son of Mrs. Pilot? Yes. Yes. Yes. Which does lead me to kind of a point there in terms of, you know, what was going on with James and what National Material was trying to do, what Cyrus Tang was trying to do. Because once the investor came in, initially PBS-1 as a limited partner, paid $6.5 million or thereabouts for their limited partnership interest here, and then came along National Material. National Material paid $5.5 million. National Material ended up investing another $12 million to correct the problems that they uncovered due to James' financial irregularities, due to James' running of the company where they had substantial economic problems that – I'm sorry, not economic, but – well, actually, they were economic, but environmental problems that were cast aside and hidden. And here we have National Material. Here we have PBS-1 trying to do whatever it takes to save this company, investing substantial sums. National Material ends up, in addition to its $5.5 million to buy into the limited partnership interest, investing another $12 million. So then I think it strains credulity, actually, to say, okay, they're trying to engage in some sort of corporate shell game to avoid their responsibilities under the consulting agreement where they're ending up paying – or would end up paying $1 million in the consulting agreement, but they actually had $17 million going to this company. But again, setting aside that issue, can you focus in on the issue of this identity of ownership? Yes. How that doesn't apply here in light of Mr. Tang's involvement with all these corporations. Why doesn't that exception apply as a trial court found? That exception does not apply, Your Honor, because, again, yes, we have Mr. Tang having a substantial interest in several companies, and they're in the scrap iron and metal business. Mr. Tang, when he signed these documents, did so in his official capacity. But to just say that just because Mr. Tang has an ownership interest in all these companies that this meets the mere test of a continuation of the same thing. There are several other aspects involved here in terms of what these companies do and what has been going on. The law in Illinois on the limited partnerships, on corporations, and I understand we're talking about an exception here, but the mere fact that Mr. Tang had a valid restructuring and followed Illinois law doesn't mean that there was some sort of purpose here to evade credit. So what was the purpose of all of this restructuring? The purpose was both corporate restructuring and estate planning for Mr. Tang. Nothing to avoid, no some sort of illicit purpose, nothing to avoid anything. It's just doing business, and everything was done in full compliance with Illinois law. So how would a creditor in the position of Mr. Pilot then ever protect himself? They end up winning this agreement in good faith. They end up not having an ability to enforce this under the survival statute, which is another argument I'm sure you'll touch on. So where does that leave them? Well, Your Honor, where it leaves them is exactly with what they bargained for, and I guess that's what my initial point was. That was the initial rub. There we go. Thank you for bringing me back there, Your Honor. I appreciate it. It wasn't intentional, but fortuitous. I understand, but I'm going to take it anyway. But that's the whole point of it. They got what they bargained for. What they bargained for was a continuation of payments until the death of Mr. Pilot and or his wife, whichever occurred later. Correct. They didn't bargain to lose their payments, did they? They did not bargain to lose their payments. They also did not bargain for some sort of lifetime annuity, as I mentioned. They bargained for their payments while the company was good, and the company was good for longer than it otherwise would have been. All right, let's shift gears in a second. I'm interested in hearing your argument about you've emphasized there was a novation. What are the evidentiary facts that support a finding of a novation? Well, I think there are evidentiary judicia for a finding of novation, or at the very least to create a genuine issue of material fact that should go back on the issue of novation because what happened was we have explicit testimony here from Mr. Zavis, the attorney, that, yes, I sat down with Arthur Pilot. We discussed the fact that PBS1 was going to come in, that they were going to change Pilot Inc., later Pilot Corp., into Pilot LP. You're going to have two limited partners in that limited partnership, the other being the old Pilot Corp. This was going to make your company stronger. You're going to look to that company to make these payments and to take care of things. That was an express indication of the record by the evidence and by the deposition testimony. Well, your argument has some superficial appeal because, as we know under the law, generally speaking, an issue of novation involving intent is considered to be a question of fact, coincided by the Tartar effect. But you also have the rule, as I understand it, that for there to be a valid novation, you have to have the consent not only of the new debtor and the old debtor, but you have to have the consent of the creditor. Where is there any evidence that Mr. Pilot consented to the substitution? By the fact that Mr. Zavis testified that Mr. Pilot said, you know, okay, I'm agreeing with this. If this is going to make it stronger, if this is going to make my ability to receive my payments stronger, then heck yes, I'm going with it. Who was that conveyed to? Conveyed to Mr. Zavis. Was there any document or writing that this was ever agreed to by Mr. Pilot? That would have been a safer thing to do, wouldn't it? That certainly would have been, and perhaps we're not here this morning with that. But there is still an indication of the record that this was discussed, this was accepted, this was communicated, and we submit sufficient to make novation an issue or at least a genuine issue of material effect. So you're saying as Pilot Corp to Pilot RP there was a novation. How about to PBS 1? To PBS 1. I mean. Yes. Not the same thing? Why is PBS 1? I think it's your argument that they're not responsible, they're not liable, it was Pilot. Right, because they were going to look to Pilot LP. Pilot LP was going to take care of everything. Okay. How about consideration in the novation? Consideration in the novation? Do you need that? Not that I'm recalling. I'm rolling around the research I did on novation in my head, and I'm not recalling seeing anything on consideration, very frankly, Your Honor. Okay. Well, in your summary of this conversation that Zavis had with Mr. Pilot Sr. there, it seems you said that he, your summary of it was he told IARTOR, you're going to look to this newer company for payment, so that's fine. That's great. But the next sort of crucial step is, and not only are you going to look to them, you're going to look to them exclusively. I didn't catch that in your summary of that, and I didn't catch it when I read the summary of that conversation or when I read, I guess it was the deposition testimony or whatever, the testimony from Zavis. I'm not certain that the word exclusively, per se, was used. Well, anything that would convey the idea that not only are you looking at this other company, but you can no longer look to the original debtor. I think that's part and parcel of the whole conversation, that you're going to look to them for your payment now because they are stronger because of the limited partnership and the new investor. Okay. Well, how about the Vernon case that talks about the change in form without a significant change in substance, which is what I think Justice Hudson keeps pointing to here. Correct. I guess that's the same question that I have, is we have the chart, the beautiful chart that was done by the trial court, and it shows that Mr. Tang is the common denominator in every single one of these companies. How do you get past the Vernon case, or how do you distinguish it? Again, the way I was trying to distinguish it, and it uses a language, again, and a specific purpose has to be to acquire assets and place them out of the way of a predecessor's creditors. And at the time that this happened, in terms of national material coming in, PBS-1 didn't have any creditors. PBS-1 didn't have any judgments against it. There were no noble claims against it. They had no assets, basically. They had no liabilities on the books. So in relation to all of that, how was there this somehow bad purpose, secretive purpose, that, okay, well, I'm doing this so that I won't be held accountable to one of my other companies after I bailed them and did all of this restructuring? Yeah, but you're putting another element in there with all due respect. The case law says that the mere continuation of the exception does not require specific proof of an intent to defraud creditors. Bad faith is not an element. The case law also says, and I quote, continuity of shareholders is a key factor in the determination of successor corporate liability, which ostensibly we have continuity of shareholders. So that's the key thing we have to overcome there. And I have two responses there. That is the key factor but not the only factor. And I think just by way of our discussion, and I think we did raise this in our brief, that in terms of whether just the mere continuation, the mere same ownership is good enough to find successor liability, how can that be decided on by way of some judgment? Well, that's your alternative argument. That has more appeal. FYI. Absolutely. But we have here a trial court saying, well, yeah, I see Mr. Tang here, Mr. Tang here, Mr. Tang here, so therefore, ipso facto, there's got to be something wrong. It's got to be a mere continuation. I'm going to hold him responsible for something he didn't bargain for and he continued beyond the life of the original company. That is not enough in our view. Under Vernon, I understand we're not talking about straight fraud, but we still have to look at more than that commonality of ownership. And if it's something that still needs to be looked into, then that's a diminution of material fact. I don't see how. During all this maneuvering here, why didn't somebody, you probably can't answer this, why didn't somebody just deal with this thing square head-on? Instead of leaving it so at best for you guys, why didn't they deal with it head-on? Listen, we're acquiring either the assets or whatever we're acquiring here. People were aware of this significant obligation and say, we're dealing with this straight up here and it isn't going to be our liability. Okay. In terms of PBS-1, the documents are the documents, and PBS-1, that consulting agreement was mentioned in the documents there. In terms of dealing with this square on, I mean, in a due diligence process, this is going to be like a big, kind of in a, in a size. It's not that huge. I know that. What was relied upon here when national material came in was the general law of corporations in Illinois and the general law of limited partnerships. They were coming in as a limited partner. They were not going to be taking on the debts of the prior limited partner. That's Illinois law. That's straight Illinois law. In addition, the expressed language there doesn't say anything about, we are taking on this obligation concerning the consulting agreement. That's nowhere mentioned in there. But isn't that sort of buttresses point then? If there is no intent, if the intent is to play straight up with Mr. Pilot and his wife, then why is this sort of buried and nobody deals with it? Can't they make a strong argument that that's evidence or some indicia of an attempt to obfuscate this obligation? If they can make that argument, then that's why summary judgment shouldn't be entered, because then we still are back to needing a trial where that indicia of evidence needs to be flushed out before a trial effect. That would be the first thing. But the second thing, well, the train just went off the track. I lost track of the second thing. If it comes to you, please feel free to correct me. I will do so, Your Honor. Do you think perhaps that during all of this, as Justice O'Malley was asking about, that the estate planning was more at the forefront of Mr. Tang than actually the consolidation and disillusion of these corporations? Perhaps that could have been why- Absolutely. This is all, again, this is going back to there are indications of record that this is done because of the estate planning. The corporate restructuring was done due to the estate planning. This is a valid way for this guy to do business and continue doing business here, where he owns several companies and several interests, and some of them are in the scrap iron business. And that's all he did here. There are no allegations of the corporate formalities in Illinois were not complied with or followed. There's no nothing, everything that the plaintiff brought up to try and give some sort of bad intent or motive or fraud upon Cyrus Tang and his corporate restructuring has been shot down, or else the court said, well, for purposes of deciding these motions for summary judgment today, I'm going to presume that everything was done validly. And if it wasn't, then that's for the trier of fact. So your position seems to be, the last point you've alluded to, is that we have these legal doctrines that can be argued on either side. The plaintiff can make a strong argument for the fact that the mere continuation exception applies. You're saying your trump card is, look, we can make arguments, plausible arguments, on the other side. Ergo, they should not have gone out in a summary judgment motion. Does that seem to be reduced to the simplest terms? Reduced to the simplest terms, from the record, we don't believe that the mere succession exception applies. But if it's going to be considered for application, it can't be decided by way of summary judgment. And that is because in your argument, it's a question of material fact. That is correct. Meaning it's inappropriate then for summary judgment. Correct. Okay. Can I ask you one question, if Mr. Black doesn't mind, going into just very briefly the attorney's fees argument. Yes. The attorney's fees argument, what was raised was Rule of Professional Conduct 1.5C. Rule of Professional Conduct 1.5C says, contingent fee agreements shall be in writing. What happened here was the initial agreement between the plaintiff and her counsel was not reduced to writing. There was a writing eight and a half years later that purported to go back to what they had originally agreed upon. But the fact of the matter is the plaintiff came in and testified and said, well, I was told that I'm not going to have to, you know, I'm not going to be billed on an hourly basis. I was told that the law firm was going to recover based upon a portion of the recovery. Eight and a half years later, after the partial summary judgment was entered, here comes this letter that says we're reducing to writing what we agreed upon eight and a half years ago. I understand that, but is that your argument to make? Is that the defendant's argument to make? I believe that is our argument to make, Your Honor. You believe me upstanding. I know that the trial court ruled that there was no standing. The argument here is, first of all, under the rules of professional conduct, this has to be raised to some tribunal. And this is a very relevant issue to these defendants because if you- Sure it is. We recognize it's a sensitive matter, by the way. Right. But what happens is if that initial agreement is void and unenforceable, and she doesn't have the ability to recoup or she's not liable to them for attorney's fees, then the defendants are not liable to her for attorney's fees. If she doesn't have to pay attorney's fees because there is a void and unenforceable agreement under the rules of professional conduct, then we shouldn't be responsible for that. So you have no quarrel with the fee-shifting portion? Your quarrel is with- Our quarrel is with how things were done here and what is the fee arrangement that we're going to be responsible for, and is that violative of Illinois law and is it therefore void and unenforceable? Final question on that point. Do you have any cases that stand for the proposition that a third party does have standing to challenge the propriety of another party's attorney fee arrangement? We do not have those cases. I think this is a- Unchartered waters, then? Blazing the trailer on it, Yes, Your Honor. All right, well, Mr. Black, you don't have time for rebuttals, so we'll switch to the attorneys now. Thank you, Your Honor. May it please the Court, I'm Neal Lloyd, and I'm here with my colleagues, and Mrs. Pilot, who's here in the courtroom today. There is no dispute in this case about the fact that payments have not been made, and there's no dispute in the case about the amounts for pre-judgment interest or the amount of attorneys' fees. So what we have here is simply a dispute, as the Court was addressing, in the opening argument of my colleague, about who is actually responsible for this. I want to start, actually, where the Court finished the last argument, because this is not uncharted waters. In this Court's own decision in the major case, it says that a third party has no standing. We cited that case, the trial court cited that case, and they make absolutely no effort to distinguish it. And it makes a lot of sense why that's not true, because this is a disciplinary rule. They want to raise it with the ARDC. They can raise it with the ARDC. But it actually has absolutely nothing to do with their application for several reasons. First of all, my colleague says in the bar, if there is an invalid contingent fee agreement, then Mrs. Pilot owes nothing. Where does he get that? There's nothing in the record about that. If she wants to pay her attorney, she can pay her attorney. If she wants to not abide by the contract and void it because she says it's void under 1.5, that's her thing. What duty does she owe them? Their duty, their duty, their standing is to challenge the consulting agreement. And they didn't challenge or appeal any of the fees that were awarded under the consulting agreement. The big non sequitur here is that what they're suggesting is, whether it's under a quantum merit theory or whether it's under the contract that she signed, she has the right to pay her attorneys. And the absurdity of their point is that I don't think they dispute she has the right to say she doesn't have the obligation. And their obligation is only to the extent she has an obligation. Well, first of all, you're on two points on that. There's no evidence in the record that she has no obligation. None. No evidence. Well, the evidence would be in the form of the contingent fee agreement. But that suggests, Your Honor, that if the contingent fee agreement is invalid, she doesn't have to pay under the contingent fee agreement. That doesn't mean that she doesn't have to pay. There's no evidence in the record that she doesn't have to pay. What they're suggesting is – Well, there's testimony from her. There's plenty of evidence in there. I mean, whether it's sufficient to say there's no evidence. I mean, her statement that she never paid any fees, her statement she never thought she had to pay any fees, it was all only going to come out of what she won. That's evidence, whether it carries a day or not. But I don't think you can go and say there's no evidence at all. Well, I have one small dispute with Your Honor about the record, because there is evidence in the record that she did pay fees. So, I mean, and the checks are in the appendix. So she did actually pay fees. But their argument is that the way that you would interpret – Let's go back, then, and interpret the consulting agreement. Their argument under the consulting agreement is the way you would interpret that is that you'd say there are only three circumstances under which a party can actually get fees. They've got a valid contingency fee agreement, they're independently wealthy, or they go and borrow the money from a bank. Because otherwise, how are they going to pay? Because what they're saying is if the plaintiff actually says, I want to be able to pay this obligation, I want to pay my lawyers, but I haven't got enough money. I mean, that's exactly what the court said in the major case. The idea of fee-shifting provisions, whether they're statutory or contractual, are to encourage lawyers to come in and take these cases. The pilots sold their interest in the company. So if there's a breach of contract, it's going to be the pilots, individuals against the corporation. And that's why there's a fee-shifting provision in the contract. The award of fees was by the trial court looking at the amount of fees that were incurred in order to litigate this lawsuit. And there's been no dispute that the amounts that were incurred were reasonable. Turning to the – I'm sorry, Your Honor. I'm sorry. I was going to turn you to the survival statute. Yes. And tell me why – how do you – how do you reckon that with the fact that, as defense argued, the PBS-1 dissolved well before the obligation occurred? Well, actually, I want to dispute one point with Your Honor. I didn't think that they were saying that PBS dissolved – and Mr. Blackwell, I have a chance to correct you if I'm wrong. They weren't saying that PBS dissolved before the obligation occurred. What they were saying is that PBS dissolved before there was a nonpayment under the obligation, and so there was a breach. Now, they may dispute whether they ever assumed the obligation, but the obligation was in 1986, and they came in, and we've got the evidence of that. They dissolved in 1994, but the nonpayment – Correct. It's the nonpayment, but that's the crucial point. So their contention is that the way that the court ought to analyze a survival statute is that only if a cause of action has actually proved prior to dissolution can the court find that the survival statute applies. And our argument is that the court has to look broader because it's not simply a cause of action that exists at the time under the survival statute. There's an incurred liability, and this was an incurred liability. How about that Corning case that's cited where it seems to say that the survival statute doesn't protect anything other than causes of action that have proved before the corporation is dissolved? Well, what – and as I read Judge Aspin's opinion in that case, Your Honor, what he was talking about was a liability that wasn't determined itself until after the corporation dissolved. In other words, these benefits were set on an annual basis, whereas in this case, this obligation was actually set back in 1986. And so he didn't actually have a situation that would fall into our argument on incurred liability. And I will, you know, in all candor to the court and everybody else, I think that this actually is, in fairness, the case that's going to determine incurred liability because, you know, there are a lot of resources that have been brought to bear. A lot of research has been done that there was a specific case that said incurred liability means X. One or the other of us would have certainly brought it to Your Honor's attention. We've looked around, and there are situations – you know, this is – comes from the Model Corporations Act, and it's not a situation that happens that often. But in this particular case, we had multiple obligors who were responsible for this particular obligation. And the fact that the nonpayment occurred after PBS-1's dissolution doesn't mean that the liability was one that was incurred. I mean, as you – as the panel has noted, PBS-1 was aware of this obligation. It was scheduled under the consulting agreement. They knew about it, and no, you know, effort was ever made. There's no record evidence that any effort was ever made, as Your Honor was saying, about – you know, in this talk about innovation, about telling Mr. Pilot that PBS-1 was, you know, going to be relieved of its obligation or getting its consent to be relieved of the obligation. So it was an obligation that they knew they had. And I think that, frankly, you know, the Occam's razor point – I know, you know, Mr. Black is talking a lot about intent. The case law definition of Occam's razor? I didn't see that in the briefs. Oh, no, no. That was – I was just using rhetorical flourish, Your Honor. The notion that – the way that the trial court addressed this, I think, made a lot of sense. We think that there are alternative grounds to affirm based on the fraud problem. Let me stop you there. Sure. I think you have an argument. I think that the Corning case is a substantial impediment to you to overcome.  That's one of them being whatever rules that apply here, there's exceptions that get carved out to all of these. And so even if there's a problem with the survival statute, are there some exceptions carved out by the case law to the strict and harsh application of the survival statute that maybe you need to address? Well, certainly. I mean, you know, we – there's this Court's decision. I believe it's in the Hamilton case that the trial court addressed – and I may – I apologize if I'm getting the name wrong, Your Honor – that under certain circumstances it would be inequitable to apply the survival statute. I do believe that this would be a case in which it would be inequitable. Okay. Why is that the case? Well – Assuming that you cannot get over the survival statute hurdle, and that is a substantial hurdle, I think, why would these exceptions, these limited equitable exceptions apply in this case based on what evidentiary facts? Okay. In this particular circumstance, it is clear that taking the trial court's – not to get away from Your Honor's question, but taking what the trial court had done in terms of successor liability and assumption, there is nothing inequitable on the side of the defendants in continuing this liability. This was a liability that they knew, and it was a corporate reorganization. And my point about Oppen's razor is just to say, let's stop for a moment and not think about what their intent was. And let's say, as the trial court said, this is a perfectly rational, normal corporate restructuring. Yet, in this corporate restructuring, there's no ability by PBS1, unless they get the explicit consent of the pilots, to relieve themselves of this obligation. On the other side, the balance of the equities very strongly favors Mrs. Pilot, who didn't know about these corporate transactions and restructurings. What was happening for her was they were getting, you know, monthly payments that were coming in, but then stopped. They stop, they go and investigate, and eventually, through years and years of litigation, they realize, you know, who all the different players are. So, if the Cornett case really is an impediment, I think that this is a situation where the court should apply an equitable exception. Now, that said, within perhaps the most difficult question of the day, the most overarching question of the day, this matter went out on a motion for a summary judgment. That's correct. There's plausible arguments on both sides. So, tell us why it was appropriate to decide this on a summary judgment when there are arguably material facts on all of these issues that you're alluding to. Well, I agree with Your Honor that there are certainly colorable arguments on both sides, but I think those arguments are arguments based on undisputed facts, and they're undisputed facts for purposes of applying the Vernon test. The first is the chart that Justice Shostak alluded to earlier about Mr. Tank's responsibility. There's no dispute. There's no genuine issue of material fact about that chart. None. And there's no genuine issue of material fact. Go ahead, Your Honor. Even if that were to be acknowledged, isn't there's an intent issue that's sort of underlying all of these arguments. You have it with regard to innovation. You have it with regard to the activities of the corporation, Mr. Tank. Isn't a question of intent normally a matter to be decided by the prior effect? Look, I agree, Your Honor, that normally a question of intent is one to be decided by the prior effect. I don't think that there is any question of intent here, though, that undermines the summary judgment for three reasons. First of all, in terms of the Vernon test, fraud is one of the prongs. But the others can be applied based on objective evidence. And if there isn't a dispute, and I believe Your Honor was asking Mr. Black this very question, where is the evidence to show that this was not a mere continuation? Where's the evidence? We put forward evidence. We were the movement. We put forward evidence that it was a mere continuation. What was our evidence? We had evidence of the assumption agreement. We had evidence of the corporate successorship. We had evidence of, you know, who received these various payments. We had all of these pieces of evidence that came in that were before the trial court. Where was the evidence on the other side? The evidence on the other side wasn't actually evidence disputing those facts. It was argument about which legal standard should apply, just as Mr. Black said today. I mean, their position is Vernon really should be read to require a fraud standard. That's a legal question for this Court. Whether that's true or not is a legal question for this Court. And if it's not true, then the fact that there was an express assumption by PBS 1 is something that the Court can tell from the documents. The documents themselves are not ambiguous. You can't create an ambiguity, obviously, with parole evidence. And it says right there on the documents. I mean, if Mr. Black acknowledged, he's not acknowledging liability. He acknowledged that the documents say what they say. And what they say, what they say is that PBS 1 assumed a consulting agreement. There's no fact question about their express assumption of this obligation, and that's one of the tests under Vernon. And that's, I believe, probably why the trial court went down that particular road, mere continuation of the express assumption. We need only one of the four. And I think that there is absolutely no fact question on PBS 1's express assumption. We haven't heard one. We haven't heard a dispute. I don't think they disputed it. Well, wait. Well, if they don't dispute that, then we get summary judgment against them because the— Why is that the case? What about all of the other issues of successor and non-liability of the corporation? Why does that end the analysis, the mere fact that PBS 1 assumed the obligation? Well, let me back up here. What I thought that you were saying was that you were parsing the fact questions on successor liability as opposed to the survival statute. I mean, if the decision tree goes like this and you're trying to figure out whether, first of all, that PBS 1 assumed this obligation, I think that they did. And so that on summary judgment was correct. Right. Okay. If that on summary judgment was correct, let's put to the side our conversation about the survival statute and come back to it. Then the next question is, was the—is there any genuine issue of material fact about national material? In other words, we don't—to win this case, we don't have to prove that at the time of disillusion there was a claim against PBS 1. If PBS 1 took off its coat and put that coat on to national material, we can go against national material. So the question then is, what's the genuine issue of material fact about national material? Well, there isn't one. They argue, though, that national material is a limited partner, and they should be responsible for obligations which are beyond the amount of the investment. That's absolutely right, Your Honor. And that, again, is a legal argument. That's not a factual argument. Because the legal argument is, they say, when—at the end of the day, when you look at what their title is, their title is, we are a limited partner in this business. When you look at the documents, the authenticity of which they haven't disputed in these contracts, and you look at what the documents themselves actually say, the documents say, we assume we are succeeding to all of the rights, interests, and, crucially, obligations. And although there have been some disputes, which I think actually are not material, about the list of things in the sole memorandum, the sole memorandum is a document that they produced. They produced it. It's got their big stamp on it. And it's their executive. Okay? And it lists this consulting agreement as an obligation. Where's the fact question, again, about these pieces in terms of the successor liability contract chain? Now, I haven't addressed novation. So novation—the reason why novation doesn't apply. There are several reasons. But the first one is that, you know, when we cite them in a real case, and they don't have anything to dispute this, there actually is—first of all, the evidence is not material that there was a novation. They've got a single conversation that they try to characterize as something where Mr. Zavis, who, you know, is a named partner in one of the big firms in Chicago, he didn't paper this thing. I mean, they're entitled to reasonable inferences on summary judgment, not ridiculous inferences. Okay? And the reasonable inference of this is there's a meeting between the two of them. They say whatever they say. And then there's a written document. And the written document says absolutely nothing to relieve PBS 1 of its obligations or liability. And there's nothing. I mean, if it's as easy as what they say, then Mr. Zavis would have put in front of Mr. Pilot a document that expressly said, as Justice O'Malley said, you know, the former company is done. PBS 1 is done. Everybody in the world is done except this company. Well, that would have been the better course of action. But does the—does it have to be—does Mr. Pilot's assent have to be invited? No, I don't think that his assent necessarily has to be invited except that you've got a subsequent writing and the subsequent writing says nothing about it. And the general legal rule is that you can't go and contradict a later writing with evidence about things that happened before. Otherwise, we would litigate everything. People would try to repent the contracts that they, you know, supposedly made in haste at— they'd try to repent them at leisure later because they would say, oh, you know, I don't really like this contract. Now I'm going to basically say, oh, I didn't agree to that. And that's why the law has these restrictions on trying to contradict written documents. So why is it not a question of a material fact? Well, it's not a question of material fact because the legal standard is the evidence is not admissible to contradict the written contract. So that's an evidentiary ruling. Again, for this Court, you know, in summary judgment, obviously, we relax the affidavit rule. But Your Honors have—and the trial court has all of the same things in the trial when I'm ruling on evidence. That evidence would be barred. There would be no evidence at trial. Again, that's why summary judgment was appropriate. Further, the other piece of this that they say is, you know, the fact that he accepted checks. And these are—there are two pieces of evidence. One is this Davis conversation. The second is that he accepted checks. You can't—you can't infer—there's no reasonable inference from the fact that he accepted a check with one company's name on it that means that that was the only company he was ever going to look to for payment because he didn't know and he didn't have any reason to know what the whole corporate structure was. So although there are instances in the record where there are disputes about particular things that people said or interpretations about those disputes, all of those respectfully, I would submit to Your Honor, are side issues that are not material for the purposes of determining successor liability in this case because there's not going to be any admissible evidence on innovation and there's not going to be any dispute at trial about, you know, PBS1. I mean, there wouldn't be a trial—there wouldn't be any dispute about PBS1's assumption of the agreement and then flowing down where national material ended up. Your opposing counsel has alluded to the underlying theme that the corporate restructuring, part of which was done for state planning purposes, he's throwing out the gauntlet. Well, first of all, in his own deposition, Mr. Tang testified that he made these decisions. We have the evidence of the trial court's chart about successor liability and what we know is that—and again, I'm not going to go into the details of this, but I'm trying to address Your Honor's question about intent. We don't think it's necessary to go down the intent road, but I want to squarely address Your Honor's question. Mr. Tang said that he reorganized these companies. I mean, he put money in the PBS1 and at the end of the day, and there's some comments in the brief, there's no foundational objection to this, we ask him, who got the money? He says, I got the money. That's right there in the appendix at—in our appendix at A81. I mean, he—so what happens? There's an existing obligation. He's an officer of the company. He, you know, he signed the dissumption agreement. He knows that he has this obligation. He knows that he and his companies, he knows that he in his official capacity has this obligation to Mr. Pilot. What does he then do? He takes the money out. He dissolves the corporation. He creates this new company, which he's now been arguing for 10 years, never actually had the obligation at all. I think it's a very, very strong inference. We haven't seen the inference on the other side, really. I mean, I realize they're talking about other purposes. You can have multiple purposes. You can have a purpose to have estate planning, to corporate reorganize, and to stiff the other creditor. I mean, you can have all three purposes. The fact that they may have had two of these purposes doesn't negate the fact that they would have had the other. And again, that's not the proper motion for the trier effect, or proper issue for the trier effect. Unless the issues are completely undisputed, we haven't seen a lot of evidence on the other. I mean, if what Your Honor is saying is that the evidence on the other side is you negate content if you've got some evidence of the one, I understand Your Honor's point. I, you know, and the trier effect decided that he was not going to go down that road. We raise it as an alternative ground for affirmance. If under our alternative ground for affirmance the court thinks that there's a fact issue on that, well, then that's one, you know, to borrow the analogy about debt shares, we'll throw that one over the side. I mean, the other two are still valid. Did the trial court find Cyrus Tang personally liable in the consulting review? Yes, he did. And when did he do that? Well, he, what he, what he, what he specifically found was that PBS1, and I'm sure I have the exact site, but what he found was that PBS1 was responsible, notwithstanding the survival statute, and he found further, beg your pardon, that PBS1, having dissolved, was not going to have any assets. And there was no issue in the record. There's no genuine issue of material fact in the record that the distributee of those assets was Mr. Tang, and he's well settled as a matter of successor liability that the shareholder is responsible up to the amount of his distribution. Well, I don't know about what section of the trial court, because I'm looking at my notes here that says that in August 2nd of 2007, there's an order on damages, and the court assessed damages, quote, against, quote, each defendant found liable on, on summary judgment on their respective counts against it, and then the judgment lying back in August 31 of 2006 on summary judgment state, plaintiffs mostly for summary judgment against PBS1 on count 11 is granted, and Tang is not mentioned individually in that August 31 order of 2006, and the 2007 order references the earlier order, so I just don't know where that has happened. Didn't the court kind of give Mrs. Pilot some indication of where she can go from here, but never actually made a finding of, against Mr. Tang personally? I, and I'm trying to find the exact part where the court said, I'm remembering a piece, and I may just confer briefly with your honors and diligence with my colleagues, that the trial court determined that PBS1 was not going to have assets, and that was a specific finding given that it had dissolved, and that's where that link in the chain, I believe, was connected in answer to both of your honors' questions. Well, it just sounds to me like something that would happen under supplementary proceedings. So, I mean, obviously, there are supplementary proceedings. It wouldn't be premature to bring that up now. Well, I would say, your honor, that Mr. Tang was a party before the court. He was represented, he and PBS1 were represented by the same council, and, you know, the issues concerning the distributions to him were litigated, and there wasn't any fact question. He was deposed, and he said that he received the distribution, so. Somebody's handing you a note here. Take a look at it. That's fine. Thank you. Thank you. That could be the key to your argument. That's why we keep them around. The court went on to say, however, made their finding that said, however, once plaintiff proves up the amount of the company's liability as a result of a contractual breach, she'll have a meaningful remedy under 2-1402 against the directors who received distributions. And it cited Kennedy for that proposition. Right. But I don't think ever made that determination that Mr. Tang was the person responsible. I mean, I'm looking at pages 9 and 10 of the trial court's August opinion, and paragraph 12. That's August, what, of 31 of 2006? Yes, absolutely, Your Honor. And so it's in many places, but it's record pages 15, 611 to 15, 612, and our appendix at 117 to 18. In paragraph 12, under normal principles of corporate liability, he'd not be personally liable. PBS wanted to dissolve a corporation to possess few or no assets subsequent to the distribution. It's not an entity you can expect to collect any judgment from. So, I mean. However. However, that's correct. Correct. And once they prove up the amount of the company's liability, they'll have a meaningful remedy. Well, they proved up the amount of the liability, and the trial court then entered judgment against him. I mean, I understand where you're coming from, Justice O'Malley. My sense from the way the proceedings proceeded below is that that chain was filled in because Mr. Tang litigated the actual amount. He was before the court, represented by counsel, when that judgment was entered against him. All right. Thank you, Your Honor. Thank you for your argument, Mr. Blight. Mr. Blight, would you rebuttal at this time, please? Yes, thank you, Your Honor. Mr. Blight, can you address that last point first? Where in the record is there a finding of personal liability against Mr. Tang? Well, you know, until this morning I'd actually been struggling with what exactly the trial court did. Because the trial court never entered summary judgment against Cyrus Tang. But what the trial court did say was, as Your Honor pointed out, that I'm finding Tang obligated along with PBS-1 as a matter of law. And that plaintiff is entitled to a meaningful remedy under 214.02 McKinley. We never understood exactly what that meant or if there actually was a judgment. But it seems to me, after listening to some of the comments from the panel this morning, it seems to me that there is no judgment against Cyrus Tang. It's an invitation to say, okay, go get him under 214.02. Which, you know, again, coming in here, coming into this argument, we did raise the issue on behalf of Cyrus Tang being held personally responsible. But we always wondered about that. Where is the judgment that says summary judgment granted in favor of the plaintiff? There's no document that says that in the trial court. There is no document, no. That's the entire extent of it in the order that Your Honor has touched upon. Your Honor, as I was sitting here listening to the counsel's argument, it struck me that everything he was talking about was fact-centric. Everything he was raising, most everything he was raising, talked about, you know, factual things, factual disputes, factual determinations as opposed to straight legal arguments. I do find it ironic that when counsel said, well, you know, you can't rely upon the Zavis deposition to create an issue of fact, and that's just one isolated incident. But then he turns right around later and says on the issue of, I think it's successor liability, that you can rely upon the internal memorandum by Mr. Solve. How can we do that here? This is an internal memorandum in terms of resolving a fact in order to create a judgment or ruling on summary judgment. So you can't have one without the other. Mr. Black, let me direct you again to the survival statute. Counsel, in his briefs, and I didn't ask him this question, but in his briefs, I think he talked about, quote, unquote, a right existing before the dissolution. How is it that that right existing before the dissolution of PBS-1 does not allow them to go under the survival statute? Well, there are several reasons for that, and the main reason would be based upon the case law, because the case law says... Blankenship. Pardon? Blankenship. Blankenship, and more particularly corning. I understand corning is a district court, Northern District of Illinois, so therefore persuasive. But corning tells us straight on, blankenship tells us straight on, that the measurement here is one of the causes of action, as I said at the time. And the whole focus here, the entire focus here, has to be on June 1, 1994. That's the date of dissolution. What was going on in June 1, 1994? What corning tells us is, and that's the case where the company was supposed to pay the union benefits, and the court held that they weren't... they didn't have to pay the union benefits in 1983 and 1984 because they dissolved in 1982. Corning is straight on point here. Blankenship is a product liability case, so blankenship talks about the cause of action has to exist. That's how we are interpreting the statute. Hamilton v. Connolly talked about, well, if there's equitable considerations, we can avoid rote application, and that's your exception. However, the circumstances in Hamilton v. Connolly are egregious and certainly far more egregious than what occurred here because right before the five-year windup period, the shareholders were engaging in illegal transfer of assets. And I want to tell you, reemphasize again here, there was nothing assertive or alleged that anything was wrong or was outside of Illinois law or wasn't just a matter of normal corporate restructuring here. At the time on June 1, 1994, there was no judgment. There was no breach. There was no claim. And you're saying there was no cause of action.  There was no cause of action. But the danger there, the inherent danger there is you avoid the purpose of the Survival Act. And the Survival Act says you've got, okay, a capital law when the corporation dissolved, your cause of action was dead. By the survival action, we're making the decision to keep that cause of action alive and avoid that harshness. But we're also putting a tail on it and saying, okay, you've got a certain amount of time to wind up, and it still has to be something that is in existence at the time of the dissolution. If it's something that's maybe speculative or something that occurs four and a half years later, that doesn't fit within the ambit of the survival statute, and the survival statute is not designed to keep that alive. But the fact that really PBS1 was kept as a, I don't want to say a secret, but kind of like an anomaly to Mr. Pilot, nobody really put that in the forefront in any of the letters or any of the correspondence, anything going to Mr. Pilot. So how is he to know? I'm going to dispute respectfully, Your Honor, that PBS1 was kept as some sort of secret, based upon the fact that we have the indications and the straight indications of record that, oh, you know, here we are, I'm consulting with you about what's going on with your consulting agreement, I'm consulting with you, Mr. Zavis, concerning, okay, what's going to happen if they go to these limited partnerships, and PBS1 and investment by Cyrus Tang is going to make everything stronger. You're in good shape. He knew about PBS1. At that point, yes. At that point, yes, Your Honor, yes. Mr. Beckett, hold on just a second. Yes. You represent whom here now? I represent all defendants' appellants. So, I mean, the brief says you're representing PBS1 and Cyrus Tang, but you're actually representing the rest of them as well, then? There are two briefs, Your Honor. The second brief we are representing national material. Oh, okay. I'm sorry. So you represent the national material and employee. What about James? We don't have anything to do with James, Your Honor. James, as the record discloses, was removed from the company because of financial indiscretions and was removed from the company because of the fact that they had to repair a bunch of hidden environmental issues. James then took the family corporation and became J.P. Investments. Right. So those two entities are not represented here? No, not at all. The issue there is, quite frankly, James and J.P. Investments both declared for bankruptcy. James moved to Florida. There, essentially, there's no way for the plaintiff to recover from James or from the company, and that's when the attention was focused back here. What's the position of your clients regarding James' responsibility for this thing? Now, you're not taking a position as his lawyer, but, I mean, are you guys pointing the finger at James at all? There was some allusion to that. Other than this environmental problem, I mean, as far as the liability. I think we're pointing the finger at him as the bad guy, as the reason we're here. Bad guy with no money. As the bad guy with no money. Because he had the obligation or what? Well, he told his parents, I'm going to take care of you for life, and the company's going to take care of you for life. It didn't happen. It didn't happen. Once they couldn't go after him, once he ran off with the $3 million payout and invested it in his new company, well, the pilot company became the J.P. Investments Company, and now he's operating Dunkin' Donuts or whatever he's doing. He took the $3 million payout and there he went. And he's in Florida and he's in bankruptcy. Your Honor, a couple of things. What I was getting at is in these deals that took place, the corporate restructuring and everything like that,  the obligation didn't transfer to your clients, any of them, but it remained with James. Are you saying the obligation was completely gone and it wasn't anybody's responsibility? I think the point we're making is it remained with the operating company so long as the operating company was in good standing. Was what? So long as the operating company was in good standing. Pilot LP. Pilot LP, yes, and renamed Midwest Metallics, correct. That's the obligation. I did want to point out one thing. Your Honor had asked, we talked about in terms of the contingent fee agreement, whether we're blazing new trails and all that kind of thing. I did neglect that we have cited an 11th Circuit case, and that's at page 48 of our brief. It's the Fulton v. Jacksonville v. Argonaut case. It's a similar setting, oral contingent fee setting, where the court has held a party should not have to pay the plaintiff's fees when the plaintiff's own attorney fee arrangement with its counsel violated the rules of ethical conduct. So we did cite a federal case out of the 11th Circuit. As to the major case that they talked about and cited in this area, I would note that I believe that that is distinguishable from this case because we're talking about an unconscionability issue as opposed to this very specific, very mandated rule of professional conduct, 1.5C. All right, Mr. Black, thank you for your argument. I thank both parties for their arguments. It's a matter to be taken under advisement. The decision will issue a due course or a sustainability assessment.